Arthur Davidson WEST, Individually and in the Name and Right of West Lumber Company, West Enterprises, Inc., and West Equipment Company, Plaintiff,

v.

Charles B. WEST, West Lumber Company, West Enterprises, Inc., and West Equipment Company, Defendants.

Civ. A. No. 1:88–CV–1577–JOF.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 1992.

Harmon White Caldwell, Jr., Johnson & Montgomery, Alex D. McLennan, Jr., Wade H. Watson, III, Fellows, Johnson, Davis & LaBriola, Atlanta, GA, for plaintiff.

Frank L. Wilson, III, Richard Walton Wilson, Jr., Peterson, Dillard, Young, Self & Asselin, Carey P. DeDeyn, Elizabeth Vranicar Tanis, Sutherland, Asbill & Brennan, Atlanta, GA, for defendants.

## ORDER

FORRESTER, District Judge.

This matter is before the court on plaintiff's motion for leave to file a third amended complaint; plaintiff Arthur Davidson West's motion for partial summary judgment concerning the affirmative defenses of set-off, estoppel and unclean hands; Defendants West Equipment Company, West Enterprises, Inc., West Lumber Company, and Charles B. West's cross motion for summary judgment concerning affirmative defenses; defendants' motion for summary judgment as to counts one and two, direct recovery claims; and defendants' partial motion for summary judgment as to counts three and four, derivative recovery claims.

## I. BACKGROUND

This shareholder action resulted from the falling out of a father and son. The father, Charles B. West, Sr., reorganized the family assets and now runs and controls the family businesses and has established a complex corporate and trust structure in order to provide for his five children upon his retirement. As part of this close corporation system, each sibling has a primary interest in one of the five principal West family corporations. The son, Arthur Davidson West, was a favored member of the family, receiving support from the father and the family corporations which he controlled. Eventually, due to the son's serious financial difficulties resulting from the failure of various business ventures, the father cut the son off from receiving the use, support and benefits from the assets of the family corporations which his other siblings received. After a failed attempt at reconciliation, this suit followed.

The primary issues involved in this dispute require the court to determine whether the plaintiff comes into court with unclean hands due to his past participation in the same types of acts which he relies on in support of his complaint; whether Georgia law permits a direct recovery to the shareholder on the facts present; whether federal or state law governs the bringing of a derivative action pursuant to *Federal Rule of Civil Procedure* 23.1; and whether under Georgia law plaintiff has standing to sue on behalf of various of the West family corporations, where plaintiff is not a direct shareholder of record.

The purpose for these reorganizations, which began in 1974, allegedly was to ensure Charles, Sr.'s control of the West family corporations, allow him to name all directors and to appoint the officers for each West family corporation. Charles, Sr. is the chairman of the board of each West family corporation. Plaintiff argues that Charles, Sr. has acted to squeeze out or oppress plaintiff as a minority shareholder. The alleged purpose of this squeeze-out "is to deny the minority shareholder a fair return on his ownership interest in the corporation or force the minority shareholder to sell his stock to the controlling shareholder for less than its true value or both."

Defendants argue that they have never denied plaintiff a fair return on his ownership interests in the West family corporations, and, in fact, plaintiff has used his West ownership interests on numerous occasions for personal gain. Defendants note that there are no buy-sell agreements, shareholder agreements, by-law provisions or other arrangements which would restrict the sale or transfer of plaintiff's stock interest in the various West family corporations. "Each stockholder of these corporations is free to sell or otherwise transfer his or her shares without restraint to any person for any price or consideration." Plaintiff has on previous occasions freely transferred shares of his West family corporations stock to other per-

sons and on two occasions has transferred and assigned to lending institutions shares of West Lumber Company stock owned by the plaintiff as security for loans. These loans totaled several hundred thousand dollars and were used in connection with plaintiff's personal business ventures, allegedly unrelated to any West corporation activity. Other than the aforementioned transactions, it appears that plaintiff has made no effort to sell his ownership interest in the West family corporation.

Three motions for summary judgment are currently pending before the court.[1] Plaintiff has moved for summary judgment concerning the affirmative defenses of set-off, estoppel and unclean hands asserted by the defendants. Defendants have also moved for summary judgment concerning the affirmative defenses of set-off, estoppel and unclean hands. The defendants have also filed a motion seeking partial judgment as to counts one and two of plaintiff's complaint based on a judgment on the merits concerning a number of transactions which plaintiff alleges represent fraudulent conveyances of corporate assets in his complaint.

Subsequent to the filing of the parties' original motion for summary judgment concerning affirmative defenses, the parties agreed as to plaintiff's liabilities regarding the issue of set-off.[2] As of January 31, 1989, plaintiff acknowledges owing the various defendants approximately a total of $597,781, including principal and interest, for various transactions taken on plaintiff's behalf by various West corporate entities.[3] The par-

ties have agreed that no other transactions requiring set-off would be considered or raised. Thus, the court considers the issue of the set-off affirmative defense settled.

The court finds that the interests of equity dictate that plaintiff be barred from seeking a direct recovery from defendants because he has received significant personal benefit to the detriment of various West family corporations from his participation in substantially similar transactions and, therefore, comes into court with unclean hands. Nonetheless, the interests of fairness also dictate that plaintiff, who has acknowledged the personal benefits he has received from the West corporate entities in the past, be permitted to pursue derivative relief on behalf of the corporations in which he has an interest. Should the underlying transactions at issue be found to be fraudulent transfers or a wasting of corporate assets, this remedy permits the corporations to be made whole and all shareholders to receive their pro rata share of these benefits, without affecting the organization, operation or structure of the corporate entities. Because the court has found that plaintiff is barred from seeking a direct recovery, the court need not address the issue of the permissibility of direct recovery relief on the facts present under Georgia law.

Concerning the applicability of federal or state law to the issue of standing in a shareholder derivative suit, the court finds that where the claims are based on state substantive law, as is the case here, state law ap-

1. Fed.R.Civ.P. 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to the party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Brown v. City of Clewiston, 848 F.2d 1534, 1536 (11th Cir.1988). Once the movant carries his burden of asserting the basis for his motion, see Celotex Corp., 477 U.S. at 323, 106 S.Ct. at 2552, the non-moving party is then required "to go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." Id., at 324, 106 S.Ct. at 2553. To survive a motion for summary judgment, the non-moving party must come forward with specific evidence of every element material to his case so as to

create a genuine issue for trial. See Celotex Corp., 477 U.S. at 323, 106 S.Ct. at 2552; Brown, 848 F.2d at 1537.

2. See Plaintiff's Consolidated Brief in Response to Defendants' Motion for Summary Judgment on the Affirmative Defenses of Estoppel and Unclean Hands and Reply Brief in Support of Plaintiff's Motion for Partial Summary Judgment at 1; Defendants' Response to Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue to be Tried at 2, citing Plaintiff's Brief in Support of Plaintiff's Motion for Partial Summary Judgment at 19, 40–42, 45–46, 47–48, 49.

3. This represents principal in the amount of $370,290 and interest, determined at a rate determined by the defendants which plaintiff often contests, of $227,491. See Exhibit 2 infra.

plies. Therefore, plaintiff must be a shareholder of record to pursue his derivative claims. Nonetheless, the court finds that the existing law in this circuit and for the State of Georgia permits shareholders to initiate multiple derivative actions. This outcome is particularly appropriate where, as here, the ownership and control of the various corporations at issue are centrally held by the same entity. Therefore, plaintiff may sue on behalf of all West family corporations where he is a direct or derivative shareholder of record.

## A. Summary of Contentions

Plaintiff Arthur Davidson West brings a shareholder derivative suit pursuant to the 1982 Georgia Business Corporation Code, O.C.G.A. § 14–2–101, *et seq.*[4], seeking both direct and derivative monetary relief along with equitable relief for alleged breach of fiduciary duties on the part of three corporations in which the plaintiff owns stock—West Lumber Company, West Enterprises, Inc., and West Equipment Company—as a result of the waste, fraud, mismanagement, and misappropriation of the corporation's assets.[5]

Pursuant to plaintiff's amended complaint and subsequent letter amendments, plaintiff has alleged approximately fifty-two specific transactions or events representing the alleged misuse and waste of corporate assets. Defendants, as part of their affirmative defense, have cited fifteen similar transactions in which plaintiff was a participant. All the transactions in question can essentially be grouped into three types: transactions involving real property, loan transactions, and personal or employee services or expenses transactions. The time frame for the transactions discussed in plaintiff's complaint runs from January 1, 1985 to July 25, 1988, the date plaintiff's complaint was filed. The time frame for the transactions referred to by the defendants in support of their affirmative defenses runs from 1972 to May 1987.

In count one of plaintiff's amended complaint, plaintiff seeks an accounting of the books and records for the West family corporations[6] and a direct recovery of money damages against Charles B. West, Sr., for his alleged breach of duty in exercising his position as chairman of the West family corporations.[7] In count two plaintiff seeks the forced liquidation of the appropriate West family corporations[8] or in the alternative to have the court direct the West family corporations or Charles B. West, Sr., to purchase all outstanding stock owned by plaintiff in the West family corporations for a fair and reasonable price. In counts three and four plaintiff brings a minority shareholder's derivative action on behalf of each of the named West family corporations against Charles B. West, Sr., for his alleged wasting and misallocation of corporate assets.[9] Plaintiff relies

---

4. This case was filed on July 25, 1988. The Georgia Business Corporation Code was amended in 1989. At the time the complaint was filed, the 1982 Georgia Business Corporation Code was in effect. Therefore, the court will cite to the appropriate Georgia Business Corporation Code sections as former O.C.G.A. § __. *See* Exhibit 4 *infra.*

5. Plaintiff has sought leave of the court to file a third amended complaint in which plaintiff seeks to add seven new corporate parties as defendants, modify the existing derivative claims, and summarize in one document acts or omissions on the part of the defendants which are alleged to represent an inappropriate use and wasting of corporate assets supporting plaintiff's claims. This list of acts alleged to violate the Georgia Business Code is a compilation of two letter amendments submitted by plaintiff to the defendant per the direction of the court on July 17, 1989 and June 8, 1990. Plaintiff's motion to file

a third amended complaint is fully discussed in Section II(D), *infra* at 1056.

6. The term "West family corporations" generally refers to all corporations which are controlled and operated by West family members. There are five "principal" West family corporations which are primarily involved in the dispute in the case *sub judice*. These corporations are the West Lumber Company, West Enterprises, Inc., West Equipment Company, First Republic Company, and the West Corporation.

7. Count one is brought pursuant to former O.C.G.A. §§ 14–2–152, 14–2–152.1.

8. Plaintiff seeks the forced liquidation of the West family corporations pursuant to former O.C.G.A. § 14–2–285.

9. Plaintiff brings count three pursuant to former O.C.G.A. § 14–2–123 and brings count four pursuant to former O.C.G.A. § 14–2–154.

upon the same fifty-two transactions and events in seeking direct or derivative relief pursuant to counts one through four. In count five plaintiff seeks punitive damages and in count six seeks expenses, costs and attorney's fees for this action.[10]

Plaintiff argues that he has no control over and no way of benefiting from substantial assets that he rightfully owns. Therefore, plaintiff argues that the key issue is whether or not plaintiff has been fairly treated as a minority shareholder in the West family corporations since 1984, and not whether plaintiff has benefited as a result of being a member of the West family. As a shareholder plaintiff asserts that he has been locked out of the West family corporations as a result of the improper and fraudulent acts of the defendants. Plaintiff seeks, first, to recover the full value of his ownership interests in the West family corporations through either the forced liquidation of said corporation or by the forced sale of plaintiff's stock ownership interest in those corporations. Second, plaintiff seeks a recovery on behalf of the corporations of all improperly or fraudulently transferred assets through various shareholder derivative claims.

Defendants argue that what is really at issue in this case is a shareholder derivative action to recover, for the benefit of the West family corporations in which plaintiff has a direct interest, any amounts found to represent waste and mismanagement of corporate assets in connection with certain transactions and arrangements between the West family corporations and the West family shareholders. Defendants argue that plaintiff has not been excluded from benefiting as a shareholder in the West family corporations. Nor is plaintiff precluded from exercising control over any corporate assets which he directly owns. In fact, defendants cite instances where plaintiff used and transferred certain of his West family corporation interests for

his personal benefit. Defendants contend that plaintiff's father and the West family corporations have repeatedly used corporate assets to promote, rescue or attempt to rescue plaintiff's business enterprises and plaintiff directly from his poor judgment and extravagance which has resulted in financially disastrous consequences to plaintiff and his endeavors. Thus, defendants argue, only after plaintiff's father has refused to support freely plaintiff's endeavors does plaintiff come into court and attempt to force his father and the West family corporations to distribute the full value of plaintiff's ownership interest, which plaintiff believes is being improperly withheld and controlled.

### B. Statement of Facts

The West family corporations are a closely held corporate group. The vast majority of the stock in the various West corporations is held by West family members. Nonetheless, there are non-West family members who are stockholders in the West corporations.[11] The family patriarch is Charles B. West, Sr. (hereinafter "Charles, Sr."). Charles, Sr. and his wife, Marjorie B. West (hereinafter "Marjorie West"), have five children. These children include Plaintiff Arthur Davidson West (hereinafter "plaintiff" or "David"), Charles B. West, Jr. ("Charles, Jr."), Marjorie West Wynne (hereinafter "Marjorie Wynne"), George Vincent West (hereinafter "Vincent"), and Mark Christopher West (hereinafter "Mark").

The West children have principally obtained stock in the West family corporations through inheritance and gifts from other family members. The majority of the West children's stock came from their grandfather, George B. West, and their uncle, George B. West, Jr. The stock from their grandfather was the result of a bequest to them in his will. Additionally, the West children purchased the stock from their uncle with money

---

10. Count five is brought pursuant to O.C.G.A. § 51–12–5.1. Count six is brought pursuant to O.C.G.A. § 13–6–11.

11. *See* Defendants' Responses to Plaintiff's First Interrogatories, question 1(d), listing all owners of stock in the West family corporations. For example, Michael A. Stern owns one share of

West Lumber Company stock, one share of West Enterprises, Inc., stock, and one share of West Equipment Company stock; Taylor W. Jones owns one share of West Enterprises stock and one share of West Equipment stock; and Sarah A. Carpenter owns 196 shares of West Equipment stock.

given to them by their grandmother, Elma B. West, either before or after her death, through a trust established for the children's benefit. Charles, Sr. has also established trusts for the children's benefit and provided various gifts of West corporation stock in support of these trusts. Specifically, on December 31, 1976, Charles, Sr. created fifteen trusts on behalf of his children. Each of the five children, including plaintiff, is the beneficiary of three of these trusts. The trusts provide for liquidation and distribution of the assets contained therein at ages fifty, fifty-five and sixty, respectively. Charles, Sr.'s wife, Marjorie West, is the trustee for all fifteen of these trusts (hereinafter the "West family trusts").

The aegis of the West family corporations is the West Lumber Company (hereinafter "West Lumber"). West Lumber was founded in 1892 and incorporated in 1929. In 1963 Charles, Sr. succeeded his father as president of West Lumber and in 1971, upon the death of his father, became chairman of the board of directors of West Lumber. In 1974 Charles, Sr. formed West Enterprises, Inc. (hereinafter "West Enterprises"). In forming West Enterprises, West Lumber transferred a significant part of its assets to West Enterprises. In exchange shares of West Enterprises stock were issued to the shareholders of West Lumber. Each shareholder received West Enterprises stock in accordance with their respective percentage ownership interest in West Lumber.

In 1980 three additional West family corporations were founded: West Equipment Company (hereinafter "West Equipment"), First Republic Company (hereinafter "First Republic"), and West Real Estate company, which was subsequently renamed West Corporation (hereinafter "Westcorp"). West Lumber and West Enterprises acquired a majority interest in the three new corporations by exchanging a substantial portion of their assets for stock in the new corporations. On December 31, 1986, West Investment Company (hereinafter "West Investment") was formed. West Investment is a partnership with West Lumber, West Enterprises, West Equipment, First Republic,

Westcorp, and Marjorie B. West, as trustee of the West family trusts, as partners. Each corporation became a partner in West Investment in exchange for all stock holdings the individual West family corporation held in the other corporate partners.[12] The West family trust obtained its partnership interest by contributing real estate into the partnership. Charles, Sr. was elected partnership manager. As a result, Charles, Sr. is authorized to vote the partnership's stock in each of the West family corporations. Charles, Sr. has also obtained permanent proxies from each of the five West family corporations, which permit him to vote the shares of stock which each corporation owns in the other West family corporations or partnerships.

Charles, Sr. and Marjorie B. West, who acts as trustee of the West family trusts established on behalf of the five children, and which contain and control the majority of West family corporation stock owned by the children, have created a corporate system with five principal corporations, one for each child. David's West family corporations ownership interests have been concentrated in West Equipment Company. Charles, Jr. has a concentrated minority interest in Westcorp. Marjorie Wynne has a concentrated minority interest in First Republic Company. Vincent has a concentrated minority interest in West Lumber Company. Mark has a concentrated minority interest in West Enterprises, Inc.

### 1. The West Corporations Businesses

The West family corporations are primarily engaged in the retail building materials business. West Lumber continues as an active ongoing business enterprise. Most of the retail activities are conducted through West Lumber's principal operating subsidiary, Associated Distributors, Inc. (hereinafter "Associated Distributors"). Associated Distributors essentially handles all of the management, accounting and payroll functions for the West family corporations' building materials business and, through its own subsidiaries, operates various retail home-building supply stores located throughout the Southeast. West Lumber and Associated

---

**12.** The sole exception is West Enterprises, which retained 9,101 shares of Westcorp.

Distributors employ approximately 1,700 people. Sales volume for the last four fiscal years for West Lumber and Associated Distributors has ranged anywhere between approximately $256 million and $290 million. West Lumber, as part of its ongoing business, maintains outstanding debt through various banking relationships totaling approximately $20 million. In addition, West Lumber owes outstanding trade creditors approximately $20 million.

West Enterprises, Inc., owns subsidiaries which manufacture both doors and windows for commercial use. These products are in turn sold through a subsidiary of West Enterprises, Associated Distributors, Inc. Associated Distributors operates retail facilities through which West Enterprises products are sold. West Equipment Company leases various equipment and other assets to West Lumber and Associated Distributors. This equipment includes such things as trucks, automobiles, forklifts, and fixtures. Long-term equipment leases between West Equipment and other West corporations, primarily Associated Distributors, have generated gross revenues for West Equipment over the period 1984 to 1988 of somewhere between $1.68 million and $2.2 million. West Equipment also owns substantial real estate interests in and around the metropolitan Atlanta area. Total West Equipment assets and investments for the period from 1984 through 1988 range between $16 and $18 million. First Republic Company owns various pieces of real estate, a few West retail stores, and has occasionally engaged in factoring the accounts of the other West family corporations. West Corporation, through its subsidiary corporations, engages primarily in construction and real estate development activities. These activities include building several of the West retail stores. In addition, Westcorp owns various pieces of real property. West Investment Company acts as a holding company for the various West family corporations' stock. West Investment provides no independent business function within the West family corporations organization.

Essentially, the West family corporations operate as one fully integrated business enterprise, sharing common ownership, management, offices, and in many cases employees.

## 2. Plaintiff's Ownership Interests in the West Family Corporations

David's direct interest in the West family corporations at the time the complaint was filed on July 25, 1988, included one share of West Lumber Company stock, 4,098 shares of West Enterprises, Inc., stock, and 22,540.5 shares of West Equipment Company stock. In addition, David owned two shares of West Lumber Company, one share of West Enterprises, Inc., directly, although the transfers of these shares of stock have not been recorded on the records of the various corporations.[13] Thus, at the time the complaint was filed, David owned three shares of West Lumber, 4,999 shares of West Enterprises, 22,541.5 shares of West Equipment, no shares of First Republic, and no shares of Westcorp. This represents 0.18% (West Lumber), 4.20% (West Enterprises), 22.56% (West Equipment), 0.00% (First Republic), and 0.00% (Westcorp), respectively, of the outstanding shares of the principal West family corporations.

David also owns indirect interest in the West family corporations as a result of the cross or reciprocal ownership of stock among the five principal West family corporations, either directly or through West Investment Company. Prior to the formation of West Investment, each of the five principal West family corporations held stock in one or more of the other corporations and in turn had its stock held by one or more of those other principal corporations. The creation of West Investment merely changed the organizational structure of the West family corporations, not the substance of the reciprocal or cross-ownership between the corporations. The five principal corporations simply transferred their cross-ownership in the other corporations to West Investment in return for a

---

13. David obtained one share of West Lumber Company stock from Michael Stern and obtained

the West Enterprises share and additional West Lumber share from Taylor Jones.

partnership interest in West Investment.[14] Thus, David has an indirect interest in the five principal West family corporations through their reciprocal or cross-ownership of each other that occurs indirectly through each corporation's partnership interest in West Investment. David also has indirect interest through his status as beneficiary to three trusts established for his benefit. Out of the fifteen West family trusts established in 1976, David is the beneficiary of trusts four, five and six.[15] Each of the fifteen West family trusts holds approximately a two percent partnership interest in the West Investment Company. West Investment's assets include certain real estate and varying percentages of outstanding stock of the five principal West family corporations. Each of the five corporations also has a minority partnership interest in West Investment. Plaintiff has no direct partnership interest in West Investment. David owns a total 24.-12% beneficial interest in the 1976 West family trusts (8.04% for each of the three trusts to which he is a beneficiary). A second trust established for David on December 21, 1984, holds 2,196 shares of West Equipment Company stock, or 2.20% of all outstanding shares. A third trust was established for David on August 14, 1972. This trust owns two shares of West Lumber Company and 200 shares of West Enterprises, Inc., or 0.18% and 0.20% of all outstanding shares, respectively. Thus, according to plaintiff's Exhibit 5 developed by James N. Bearden, David's total beneficial interests as a result of the trusts established in his name are 2.99% of West Lumber, 2.67% of West En-

terprises, 5.66% of West Equipment, 4.40% of First Republic, and 3.66% of Westcorp.

Defendants did not acknowledge plaintiff's indirect stock ownership interest, nor do they directly contest these indirect ownership interests. However, defendants' expert CPA, Jerry C. Gering, who was directed to analyze and determine David's ownership in the various West family corporations, essentially admitted that these indirect stock interests exist. Mr. Gering only determined David's direct stock ownership interest and his beneficial trust ownership interest.[16] Mr. Gering stated in his deposition testimony that his calculations did not account for David's indirect ownership interest as a result of the cross-ownership among the five principal West family corporations. Mr. Gering further stated that the method of analysis used by plaintiff's expert accountant, James N. Bearden, was valid and should have accurately determined David's indirect stock ownership interest. Thus, because defendants agree with the analysis used by the plaintiff's expert and have provided no other analysis of David's stock ownership interest including direct, indirect, and beneficial trust interest, the court will accept plaintiff's figures as to David's total stock ownership interest.[17] According to Mr. Bearden's analysis, David's direct and indirect stock interests in the five principal West family corporations, respectively, on July 25, 1988, the date the complaint was filed, were: 3.28% in West Lumber; 7.19% in West Enterprises; 25.88% in West Equipment; 3.84% in First Republic; and 3.82% in Westcorp. David's total stock ownership interests, including direct, indirect

---

**14.** The exception is West Enterprises, Inc., which maintains a direct 9.1% ownership of West Corporation stock.

**15.** Each child of Charles, Sr. and Marjorie West is the beneficiary of three of the fifteen trusts established.

**16.** According to Mr. Gering David's direct ownership interests were: 0.18% in West Lumber; 4.20% in West Enterprises; 22.56% in West Equipment; 0.00% in First Republic; and 0.00% in West Corp. David's beneficial trust ownership interests were: 2.99% in West Lumber; 2.67% in West Enterprises; 5.66% in West Equipment; 4.40% in First Republic; and 3.66% in West Corp. Therefore, David's direct and beneficial trust ownership interest totaled: 3.08% in West Lumber; 6.87% in West Enterprises; 28.22% in

West Equipment; 4.40% in First Republic; and 3.66% in West Corp. These calculations were determined for April 30, 1990. Thus, these calculations may not accurately depict David's ownership interests at the time this suit was filed on July 25, 1988.

**17.** The court has primarily focused on the figures of David's stock ownership interest as of July 25, 1988, the date the complaint was filed. The court is, however, aware that plaintiff has presented figures for David's stock ownership interest as of December 31 in the years 1984, 1985, 1986, and 1987. These figures are also considered an accurate reflection of David's ownership interests at those respective times.

and beneficial trust ownership interests, on July 25, 1988, were: 4.05% in West Lumber; 7.66% in West Enterprises; 28.30% in West Equipment; 4.15% in First Republic; and 4.12% in Westcorp.[18]

## II. DISCUSSION

### A. *Unclean Hands*

Defendants raise the affirmative defenses of unclean hands and estoppel as grounds for preventing a judgment in favor of plaintiff in this case. These equitable defenses are based on fifteen (15) transactions between plaintiff and various of the defendants occurring between 1972 and 1987.[19] Defendants allege that through these transactions plaintiff has engaged in the same type of activities as those relied on in plaintiff's complaint. As a result of these transactions, plaintiff has received the same types of benefits involving the use of West family corporation assets which plaintiff alleges to be wasteful or fraudulent when other shareholders engage in these types of activities and receive similar benefits. Defendants argue that by asserting the unclean hands and estoppel defenses, they are not attempting to recover the benefits received by plaintiff through his transactions with the various West family corporations, but are merely attempting to prove that plaintiff has received benefits from the defendants of the types alleged to have been provided to other family member shareholders.

Plaintiff acknowledges that the transactions in question took place, and accepts liability of certain of those obligations in which plaintiff agrees to off-set with any awards ultimately received from this case.[20] However, plaintiff contests much of the factual bases and motivations behind the transactions in question as asserted by the defendants. Plaintiff argues that the record evidence shows that plaintiff never engaged in any misconduct in the nature of fraud, misappropriation, or waste of corporate assets, nor were any of the transactions cited by defendants in support of their affirmative defense directly related to the transactions forming the basis of plaintiff's complaint.

■ The court finds that the transactions which follow represent substantially similar activities to those relied on by plaintiff in his complaint as fraudulent transfers of West corporate assets for the personal benefit of the participating West family member. In these transactions David received substantial personal benefit which would not have occurred but for his status as a member of the West family. These transactions were made for the purpose of providing David with increased income or more often in an attempt to bail David's business ventures out of se-

18. The court attempted to recreate this analysis and these numbers and was unable to do so. However, this court did not have all of the pertinent exhibits before it. Specifically, plaintiff's exhibits 16 through 24 for the Bearden deposition were missing. In attempting to determine David's total stock ownership interest at the time the complaint was filed, the court took the direct ownership interest of David which both parties agreed to, the indirect ownership interest as determined by plaintiff, and the beneficial trust interest as determined by defendant. These totals appear to give David an even greater stock ownership interest than as provided by plaintiff in the five principal West family corporations. However, as the court has previously stated, the court did not have all the pertinent exhibits before it and, therefore, has accepted plaintiff's figures as to David's true total stock ownership interest. The key to this determination is that both parties' expert accountants agreed that the analysis used by the other side was appropriate and would accurately determine the correct stock ownership interests for David.

19. The specific transactions in question listed in chronological order include: (1) the Gordon Road and Gainesville property leases; (2) insurance and property tax payments for the Gordon Road and Gainesville properties; (3) liability for the Davidson Land One partnership dissolution; (4) 1977 personal loan by Charles B. West, Sr. to plaintiff; (5) personal services of Associated Distributors employee Jack Burnett; (6) Westcorp loans to Paces Ferry Development Company; (7) personal services of Mel Wilinsky; (8) sale of the Gainesville property; (9) 1987 loan by West Equipment to plaintiff to pay debts of PFDC; (10) plaintiff's 1987 salary/loan as President of West Equipment; (11) West Equipment's payment of plaintiff's Georgia payroll taxes; (12) Westcorp's purchase of the National Bank of Georgia note owed by plaintiff; (13) personal services of First Republic employee Eric May; (14) personal expenses of defendant's trip to Ponte Vedra, Florida to meet with plaintiff; (15) the West Foundation charitable contributions.

20. See *supra* notes 17 and 18 at 1041–42 and accompanying text; *see also* Exhibit 2.

vere financial trouble or simply to cover David's unpaid debts.

### 1. *Underlying Transactions*

In discussing the underlying transactions raised by defendants in support of their affirmative defense for unclean hands and estoppel, the court will only address certain of the listed transactions which it finds amply illustrate the personal benefit received by plaintiff from the West family corporations as a direct result of his membership in the West family. Further, the court wishes to stress that in reaching its determination that plaintiff comes into court with unclean hands, that the transactions relied on by the court in reaching this determination were only those where plaintiff received benefits from the West family corporations, and not any direct benefits received solely from Charles B. West, Sr.

The fifty-two transactions relied on by plaintiff in support of his complaint can essentially be broken down into three categories or types of transactions: (1) real property sale and lease transactions; (2) loan transactions; and (3) salaries, savings account and personal service transactions. The court finds that plaintiff has personally benefited from substantially similar transactions with various of the West family corporations in each of these three categories.

### (a) *Real Property Sale and Lease Transactions*

Under this category plaintiff alleges that various West family members received favorable treatment involving the sale or leasing of real property in transactions with various of the West family corporations. In addition, plaintiff alleges that in many of these transactions, there was an appropriation of corporate credit in addition to the appropriation of corporate assets because the leases or rents obtained by the family member, which were

guaranteed by the various West entities, were then used as collateral for loans from outside lending institutions. Through these real estate transactions, the West family members personally benefited at the expense of the West family corporations.

The court finds that the transactions involving the Gordon Road and Gainesville property leases, as well as the sale of the Gainesville property cited by defendants in support of their unclean hands affirmative defense contention are substantially similar to the transactions cited by plaintiff in support of his claims. Plaintiff attempts to distinguish the lease-back arrangements entered into with Associated Distributors concerning the Gordon Road and Gainesville properties by correctly noting that plaintiff attained these properties by way of a trust established on his behalf, whereas the properties and leasing arrangements noted in plaintiff's complaint permitted West family members to obtain the property through financing supported by a West entity through the leasing of the property owned by the West family member from the West entity.[21] Nonetheless, the court notes that the lease arrangement with a West entity to the Gordon Road and Gainesville properties was originally established at the time the trust bestowed these properties to plaintiff, just as the lease arrangement to these new properties was established at the time they were created. The point of these transactions, and the reason the court finds these transactions to be substantially similar, is to establish a vehicle, in this case favorable lease arrangements, whereby Charles B. West, Sr., may provide the West family member with income to be used for his or her personal benefit. Through these transactions the West family corporations maintained control and use of the properties in question, while the West family member owning the property received a substantial income to use as he or she saw fit.[22]

---

21. For a detailed discussion of the creation of these lease buy-back arrangements and the alleged transfer of corporate equity and store sites, see Plaintiff's Response to Defendants' Motion for Summary Judgment as to Counts One and Two and for Partial Summary Judgment as to

Counts Three and Four of Plaintiff's Amended Complaint at 15–22.

22. Nor does the fact that the transactions involving the Gordon Road and Gainesville properties appear to be arms length transactions change the court's findings. Arguably, the West corporate

### (b) *Loan Transactions*

Plaintiff alleges that various of the West corporate entities made loans to West family members at favorable interest rates which have never been repaid. Nor have the West family corporations attempted to obtain repayment of these loans.

The court finds that Plaintiff David West has received substantially similar loans of significant value which have personally benefited plaintiff to the detriment of the various West family corporations involved in the loan transactions. The purpose of the vast majority of these loans was to provide David with additional financial resources in order to permit David to attempt to rescue failing and deteriorating business ventures, as well as to pay off personal debts. These loan transactions in no way resembled normal financial arrangements between independent entities conducted at arms' length in the market. In reality, these transactions were a father's attempt to help his son salvage dying business endeavors which the son had been unable to manage and maintain. In fact, most of these loans were instigated by the son when his debts had accumulated to the point that he was unable to obtain financing through any normal lending institution but nonetheless needed immediate infusions of cash.

### (1) *Davidson Land One Partnership*

At some point during the early 1970's, David West created and became the sole shareholder of Davidson Land Company, which was engaged in the business of building residential homes. By 1975 Davidson Land Company was experiencing financial difficulties. Charles, Sr. and David discussed the Davidson Land Company's difficulties and agreed to enter into a partnership. This partnership was created between David and West Enterprises. The partnership was known as Davidson Land One. Davidson Land Company transferred real property and partially completed homes to Davidson Land One as part of the partnership formation. West Enterprises provided immediate cash contribution of approximately $58,017.00 and subsequently provided a series of loans totaling several hundred thousand dollars. Davidson Land One was also provided at no cost the assistance of one of the West corporate employees in order to help plaintiff organize and manage this residential construction business.[23] Under the terms of the partnership agreement, David West and West Enterprises were to share equally in the profits, losses, obligations and expenses of the partnership.

The Davidson Land One partnership continued for approximately three years until 1978. During this period plaintiff's home construction business never prospered, and the partnership was unilaterally dissolved by Charles, Sr. Father and son never came to an agreement on the dissolution of this partnership, and no accounting of the partnership dissolution was ever made. West Enterprises absorbed losses as a result of this partnership by virtue of the loans it made to the partnership. Plaintiff has never attempted to pay off his share of the losses resulting from the dissolution of the Davidson Land One partnership, nor has West Enterprises ever sought to collect this debt from plaintiff.

Plaintiff contends that these transactions in no way support defendants' contentions that the doctrine of unclean hands bars plaintiff's recovery in this action. Plaintiff argues that the Davidson Land One partnership transactions are not directly related to the

entities involved in these transactions materially gained from each lease arrangement or purchase agreement that they entered into with the various West family members. The underlying purpose of these transactions remains the same: To provide the corporations with the use of the properties in question and provide the West family member with a steady income stream.

**23.** In addition, Charles B. West, Sr., personally loaned David $150,000.00 to provide additional financing in support of plaintiff's faltering residential home building business. Although the court notes that this transaction is a personal loan between Charles B. West, Sr., and David West which does not involve any of the West family corporations, the court notes the transaction because it provides independent support of the contentions that plaintiff's Davidson Land One Company was experiencing financial difficulties and needed additional investment capital. Plaintiff has admitted that he is still indebted to Charles B. West, Sr., in the amount of approximately $120,000, plus interest as a result of this loan.

transactions forming the basis of plaintiff's complaint, and that because defendants would have no legal remedy against plaintiff relating to these transactions, either under the doctrine of laches or appropriate statute of limitations or the lack of a financial accounting during the dissolution, that, therefore, these transactions should not form the basis of a defense in equity. Plaintiff misses the point. The court finds these transactions support a finding of unclean hands, not because plaintiff can ultimately be held accountable for the debts resulting from these transactions, but rather, because these transactions represent the same type of financially beneficial arrangements involving the use of corporate assets which plaintiff relies on to support his claims in his complaint. *See, e.g.,* Plaintiff's Third Amended Complaint at 30–32, ¶¶ 39–45 (particularly the transactions between First Republic and Joe B. Dodd creating the corporation known as Joe B. Dodd Construction Company). The facts show that plaintiff's company materially benefited from a favorable transaction with a West corporate entity involving a personal business venture which would not have occurred but for plaintiff's status as a member of the West family.

### (2) Paces Ferry Development Company

In 1982 David West created a corporation known as Paces Ferry Development Company (hereinafter "PFDC"). PFDC was created for the purpose of building and developing a strip shopping center known as Paces Ferry Place in the Buckhead area of Atlanta, Georgia. Construction of Paces Ferry Place was substantially completed in 1985. The construction was principally financed by First City Federal Savings and Loan Association of Bradenton, Florida, which later became CrossLand Savings Bank. First City provided $2,400,000.00 in funding for the construction of the project. Plaintiff never obtained permanent mortgage financing for the project. In late 1984 Charles B. West, Jr., David's brother, discussed the potential of David using Westcorp Mortgage, a subsidiary of Westcorp specifically created for the purpose of providing commercial loans, to assist David in securing permanent financing for Paces Ferry Place. In order to secure permanent financing for the project, David was required to provide certain financial information including a current appraisal and rent rolls so that a loan package could be prepared. The financial information provided was insufficient to obtain a loan approval for the permanent financing of Paces Ferry Place.[24]

At some point in early to mid–1985, Paces Ferry Development Company and the Paces Ferry Place project began to run into serious financial troubles. In mid–1985 plaintiff borrowed significant sums of capital from C & S National Bank, First Atlanta and National Bank of Georgia. This capital was used to support the Paces Ferry Place project and for various retail businesses which plaintiff had an ownership interest in and which were located at the Paces Ferry Place shopping center. As collateral for the C & S and First Atlanta bank loans, plaintiff pledged West Lumber Company stock which he owned.

In late August of 1985, David contacted Charles, Jr., expressing concern about the Paces Ferry Place financial situation and his inability to secure permanent mortgage financing for the project. By this time the Paces Ferry Place project was generating negative cash flow with revenues insufficient to cover debt service and operating expenses. The PFDC construction loan had been placed on a $28,000 per month amortization schedule. The C & S and First Atlanta loans had gone into default, and these banks had placed liens against the shopping center property to secure the outstanding debt. One of the principal reasons for the project's financial difficulties was plaintiff's inability to obtain a sufficient number of paying tenants for the shopping center (only eleven of seventeen available sites in the mall had been filled, and only six of these were providing rental income).

In order to alleviate the immediate serious financial problems which the project was experiencing, and in order to continue efforts to

24. Westcorp Mortgage had approached Magnolia Federal Bank in Hattiesburg, Mississippi, to provide permanent mortgage financing for the project, because Magnolia Federal had expressed interest in providing permanent loans for such projects in Atlanta.

obtain permanent mortgage financing for the project, Westcorp loaned PFDC significant capital to cover operating costs and debt financing. Specifically, Westcorp advanced to PFDC $150,000 in August of 1985, $150,000 in September of 1985, and $75,000 in October of 1985. These loans were executed by David and PFDC through unsecured promissory notes made out in favor of Westcorp. Westcorp made these advances per the direction of Charles B. West, Jr., who had previously consulted with and obtained the approval of the loans from Charles B. West, Sr.

During this same period the West family became increasingly concerned about David and PFDC's financial soundness. A summary of David's debts compiled by Westcorp personnel indicated that as of September 30, 1985 his debts totaled $4,050,000. David requested additional advances on behalf of PFDC, but these requests were denied by the West family because David failed to account and show that the prior advances were being used to defray existing obligations.

At this point David retained counsel to represent him on behalf of PFDC and left Atlanta and moved to Florida and, subsequently, to the Bahamas. At this time the financial condition of PFDC had not improved, David had ceased efforts to obtain permanent mortgage financing, and the existing loan defaults had not been resolved. Nonetheless, on January 6, 1986 Westcorp made a final loan to David and PFDC of $219,000. As part of this loan agreement, this final disbursement and all of the three previous advances with interest accrued to date were consolidated into one new promissory note totaling $601,375.00, which was executed in favor of Westcorp. This note contained an exculpatory clause in which plaintiff's personal liability was limited to the security given. The note was secured by two deeds to property owned by PFDC and plaintiff. Specifically, Westcorp took a sixth lien position on the shopping center property owned by PFDC and a fourth or fifth lien position on an adjacent property owned by plaintiff. The loan was never repaid, and PFDC filed a bankruptcy petition in October of 1986. Westcorp filed a proof of claim against PFDC in bankruptcy court but determined that the various debt interests ahead of Westcorp's position were in excess of the real value of the property, and, therefore, no further action was taken. Plaintiff has never attempted to repay this note prior to the filing of this action, nor have defendants attempted to recover their losses from these loans.

In addition, on July 31, 1987, West Equipment paid the State of Georgia $9,896.00 to cover unpaid and delinquent payroll taxes owed by three retail businesses located in the Paces Ferry Place shopping center and for which David was president and personally liable. Plaintiff acknowledges this debt and admits that he is liable for it although he contests the way interest on the debt has been calculated.

Contrary to plaintiff's contentions that these loans represented arms' length transactions meant to benefit both parties mutually, the court finds that these loans represented nothing more than a father's attempt to rescue a son's failed business enterprise. The original loans were unsecured and were executed without any of the normal evaluation into the debtor's finances prior to the execution of the loans. Nor does the court agree with plaintiff's contention that these were merely business transactions conducted for the purpose of providing financial gain to Westcorp Mortgage. However, even assuming these loans were made for valid business reasons, there simply is no justification, other than to support a West family member, for the final loan and consolidation of all advances Westcorp made to PFDC. Plaintiff had defaulted on all of his financial obligations, plaintiff had run from these financial obligations, and there was absolutely no reasonable prospect, given the knowledge of PFDC's financial state and plaintiff's previous actions, that these loans would ever be repaid to Westcorp. The fact that plaintiff may not be held personally liable for these loans because of the exculpatory clause contained in the note, does nothing to change the fact that these transactions never would have occurred if David were not a member of the West family. Thus the court finds that these loans represent fraudulent transfers of

West family corporation assets executed for the personal benefit of plaintiff and substantially similar to the loan transactions cited by plaintiff in support of his complaint. *See* Plaintiff's Third Amended Complaint at 30–34, ¶¶ 39–52.

(3) *1987 West Equipment Company Loans*

In the spring of 1987, and as a result of the debt accumulated from his previous failed business ventures, David called Charles, Sr. and requested immediate financial assistance. David had been unemployed since leaving Atlanta in November of 1985 and needed money to pay living expenses. Charles, Sr. immediately traveled to the Bahamas and met with David to discuss his financial situation. Apparently David's outstanding debt still exceeded two million dollars, even after PFDC's bankruptcy and the foreclosure on various of David's loans.

The plan discussed was for Charles, Sr. to find buyers within the West family to purchase an unspecified amount of David's West stock holdings, which would then be used to pay off David's debt and satisfy his creditors. According to Charles, Sr., David's stock holdings were more than sufficient to pay off the debt. In the meantime, Charles, Sr. offered to have West Equipment Company advance David $150,000 to pay off some of his immediate expenses and debt. In addition, Charles, Sr. offered to make David the President of West Equipment with a $5,000 a month salary. David accepted both of these "loans" and acknowledges that he is indebted for them. However, plaintiff contends that both of these loans were made as part of the "deal" to sell David's stock and extinguish his outstanding debt.

On May 8, 1987, West Enterprises wire transferred $150,000 to David's bank account in the Bahamas. West Enterprises was later reimbursed by West Equipment. During this period David also received four months worth of salary, or $20,000, as West Equipment's President.[25] David never performed any work on behalf of West Equipment during the period he was receiving a salary. Shortly after receiving the $150,000 advance, David contacted Charles, Sr. to request an additional $50,000 advance. This request was turned down because Charles, Sr. did not feel that David had adequately accounted for how the original $150,000 was spent.[26] At this point the "deal" began to break down. Charles, Sr. wanted David to produce his stock certificates before he found a buyer for them. David refused to produce the shares until the sale was completed. Ultimately, the sale disintegrated. After four months, Charles, Sr. terminated the payment of David's salary. David has never repaid any on these outstanding debts to West Equipment.

In addition, as part of the "deal" to get David out from under his accumulated debt, Westcorp purchased, on June 30, 1987, an outstanding note from the National Bank of Georgia for $70,394.08.[27] West Equipment then purchased the note from Westcorp on July 15, 1987. David acknowledges the debt and agrees that he is liable for it, although he contests the way in which interest has been calculated on the note.

Plaintiff argues that these loans or payments are not similar to the transactions contained in plaintiff's complaint because they were part of a "deal" to sell his West stock interests in order to pay off his debt. Further, plaintiff implies that the true motivation of Charles, Sr. in arranging the stock sale was to "freeze" David out of the West family businesses while David was down and financially strapped. Because David planned on repaying West Equipment with his stock sale proceeds, there was no fraud or misappropriation of corporate assets as occurred in the other cited transactions. Therefore, plaintiff contends these transactions have no relevancy and provide no support to defendants' unclean hands affirmative defense.

---

**25.** The actual amount received was $11,793 because of withholdings for taxes.

**26.** David contends that he informed Eric May, the Chief Financial Officer for West Equipment, that he used the money to pay a note in excess of $100,000 to the Park Bank, to pay Visa and Mastercard accounts at Bank South, First Atlanta, and C & S National Bank, and to pay living expenses.

**27.** The original principal amount of the note was $80,000.

The court disagrees. Even assuming this advance and salary were part of a "deal" to sell David's stock in order to satisfy his debts, they also are beneficial payments made by a West corporate entity per the direction of Charles, Sr. to a sibling for his or her personal benefit. Yes, these payments were meant to be repaid, if the sale went through, but this does not change the fact that they never would have been made in the first place had David not been a member of the West family. Yes, because David was in financial trouble, Charles, Sr. had leverage to specify the terms of any sale of David's stock. However, there is no indication that David was going to get anything less than fair market value for his stock and based on prior history, likely would have received a premium price. Nor is there any evidence indicating that David was unable to, let alone tried to, sell his shares in the open market. Further, there is no indication in the record that had the sale gone through, David would have forfeited his job as President of West Equipment.

In reality these actions were an attempt at a father and son reconciliation which ultimately failed. This was not an attempt to force a minority shareholder out of the business. This was an attempt to solve David's financial problems with the only assets he had available to cover the massive debt he had accumulated. Nor is there any evidence indicating that had Charles, Sr. declared regular dividends for the West family corporations that this would have alleviated or prevented the financial difficulties which David created for himself. An explanation closer to the truth for the actions which occurred might be that after calling father for help and receiving enough money to alleviate his immediate financial needs, the son backed out of the "deal" because he did not like the requirements, limitations and responsibilities that the father was placing on him in return for essentially supporting the son.

The court finds that David did personally benefit from these transactions to the detriment of West Equipment and, notwithstanding the intent to repay the loans, that these payments are substantially similar to the alleged transactions representing a misappropriation of assets in plaintiff's complaint.

### (c) *Salaries and Personal Service Transactions*

The court has already discussed the salary David received as President of West Equipment. The court will only further note that David was permitted to and did receive personal services, such as free work on his cars, during the periods where he was interacting with the other West family members. Nonetheless, the court finds most of defendants' claims in support of their unclean hands affirmative defense under this heading to be meritless. In any case the court does not rely on any claims cited by defendants under this heading, except as previously discussed, in reaching its decision on the applicability of the unclean hands doctrine.

### (1) *Legal Standard*

The Georgia courts have long considered the unclean hands maxim as a fundamental doctrine to be applied by courts in equity. The unclean hands maxim simply states that he who seeks equity must do equity. *See* O.C.G.A. § 23–1–10; 30 C.J.S. Equity § 90 at 983; *Dixon v. Murphy*, 259 Ga. 643, 644 n. 2, 385 S.E.2d 408 (1989) (quoting O.C.G.A. § 23–1–10). This doctrine has been described as "one of the oldest and best settled and most familiar maxims in equity. It is applicable in every type of case." *Eastman Kodak Co. v. Fotomat Corp.*, 317 F.Supp. 304, 311 (N.D.Ga.1970), *appeal dismissed, Eastman Kodak Co. v. Fotomat Corp.*, 441 F.2d 1079 (5th Cir.1971). The fundamental policy foundation underlying the unclean hands doctrine is maintaining the integrity of the court. As then-Judge Learned Hand stated,

> The doctrine [of unclean hands] is confessedly derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge. It has nothing to do with the rights or liabilities of the parties; indeed, the defendant who invokes it need not be damaged, and the court may even raise it *sua sponte.*

*Art Metal Works v. Abraham & Straus*, 70 F.2d 641, 646 (2d Cir.1934) (Hand, J., dissenting).

The unclean hands maxim does not normally permit any recovery on the part of the plaintiff. "[T]he maxim, if applicable, require[s] the district court to halt petitioner at the threshold and refuse it any relief whatsoever—not to compromise with it." *Manufacturers Co. v. McKey*, 294 U.S. 442, 451, 55 S.Ct. 444, 448, 79 L.Ed. 982 (1934). This same general principle is equally applied by the courts of Georgia. *Dixon*, 259 Ga. at 644, 385 S.E.2d 408 ("we are aware of no authority that vests in a trial court the power to make equitable distribution in a case of unclean hands"). Unclean hands generally prevents the court from even considering the merits of plaintiff's claims. *Claire v. Rue de Paris, Inc.*, 239 Ga. 191, 194, 236 S.E.2d 272 (1977) (quoting *Smith v. Nix*, 206 Ga. 403, 407–08, 57 S.E.2d 275 (1950)). The fact that defendant may be liable for all claims alleged is simply irrelevant. *Art Metal Works*, 70 F.2d at 646. The key, however, is that there could be no equitable distribution to the unclean plaintiff.[28] As long as the plaintiff admits and accepts the equitable claims against him, then he may proceed in court against the defendants. *Charleston Railway Co. v. Hughes*, 105 Ga. 1, 21, 30 S.E. 972 (1898). Thus a plaintiff with unclean hands who has proper standing may still bring an action to enforce the rights of others and secure relief on their behalf, even though doing so may result in an indirect benefit to the unclean plaintiff.

Furthermore, the unclean hands doctrine does not attach to all prior bad acts made by the plaintiff bringing suit.[29] *Keystone Co. v. Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933). There must be a direct relationship between the allegations comprising the complaint and the acts giving rise to the unclean hands. *Keystone*, 290 U.S. at 245, 54 S.Ct. at 147 (held that courts of equity should only apply the unclean hands doctrine where there is an "immediate and necessary relation" between the unconscionable acts and the relief sought); *Dixon v. Murphy*, 259 Ga. at 644 n. 2, 385 S.E.2d 408; *Sparks v. Sparks*, 256 Ga. 788, 789, 353 S.E.2d 508 (1987).

Thus, the court must determine if the prior acts of plaintiff are of such an "immediate and necessary" relation to the equity sought that the "advancement of [ ] justice" bar him from pursuing his claims. In making this determination, the court has great discretion to fashion a ruling which promotes a just and right outcome. *Johnson v. Yellow Cab Co.*, 321 U.S. 383, 387, 64 S.Ct. 622, 624, 88 L.Ed. 814 (1943) (citing *Keystone*, 290 U.S. at 245–46, 54 S.Ct. at 147–48).

### (2) *Legal Analysis*

Equity is about fairness. In reaching the court's conclusions concerning the defen-

---

**28.** In Georgia, under the "clean hands" maxim,

"[H]e who would have equity must do equity, and give effective to all equitable rights in the other party respecting the subject matter of the suit." [Cit.] The meaning of this maxim is "that whatever be the nature of the controversy between two definite parties, and whatever be the nature of the remedy demanded, the court will not confer its equitable relief upon the party seeking its interposition and aid, unless he has acknowledged and conceded, or will admit and provide for, all the equitable rights, claims, and demands justly belonging to the adversary party, and growing out of or necessarily involved in the subject-matter of the controversy. It says, in effect, that the court will give the plaintiff the relief to which he is entitled, only upon condition that he has given, or consents to give, the defendant such corresponding rights as *he* also may be entitled to in respect to the subject-matter of the suit." [Cit.].... Especially would this be true where

the relief sought by the party applying to the court is both legal and equitable in its nature. *Charleston Railway Co. v. Hughes*, 105 Ga. 1, 21, 30 S.E. 972 (1898) (emphasis in original) (citations omitted).

**29.** The Georgia courts found that:

[T]he rule that a complainant must come into equity with clean hands does not go so far as to prohibit a court of equity from giving its aid to a bad or a faithless man. The dirt upon his hands must be his bad conduct in the transaction complained of. All complainants in equity are human beings, full of faults and sin, and I doubt if there is one case in ten in which the complainant is not somewhat to blame. If the complainant does equity himself or offers to do it [ ], his hands are as clean as the court can require. *Employing Printers Club v. Dr. Blosser Co.*, 122 Ga. 509, 515–16, 50 S.E. 353 (1905) (citations omitted).

dants' equitable affirmative defenses, the court has sought to reach an outcome based on a realistic interpretation of the facts present, which promotes the right of all parties in this complex family dispute which takes the form of a shareholder derivative action, taking into account the interest of non-family stockholders.

In the case *sub judice*, the court finds that the transactions cited by defendants and admitted to by plaintiff from which plaintiff received substantial material benefit from defendants are sufficiently similar to the transactions in plaintiff's complaint that are alleged to represent the fraudulent use or wasting of corporate assets such that plaintiff comes into court with unclean hands. Plaintiff's unclean hands prohibit any direct recovery or personal reward as a result of this action. However, because plaintiff admits these acts and seeks to make restitution for any benefits derived from said acts, the court finds that plaintiff is not precluded from bringing a shareholder derivative suit on behalf of the West family corporation. Although the court believes it is within its discretionary power to enter complete summary judgment for the defendants pursuant to the aforementioned case law because the court finds that plaintiff comes into court with unclean hands, the court finds that the interests in justice weigh heavily in favor of permitting the plaintiff to continue his derivative claims. This is particularly true given the close corporation structure in question, which thereby leads the court to believe that no other shareholder would pursue these derivative claims even though they well may ultimately be found to be fraudulent transfers and a wasting of corporate assets.

Should the transactions in question be found to be fraudulent transfers or wasting of corporate assets, equity does not preclude a party with unclean hands from bringing an action which will directly benefit the corporation and not the party with unclean hands. To hold otherwise would preclude anyone who at one time participated in a fraudulent scheme or improper activities and then for whatever reason is excluded from said activities from filing suit in order to prevent any future fraudulent activities or correct any past improper conduct. Equity does not preclude those with unclean hands from doing what is right. However, equity does preclude a person with unclean hands from using the powers of the court for personal benefit.

Here, a son and shareholder accepted and personally benefited from assets provided by his father and the corporations that he controlled as chairman. Subsequently, there was a falling out between the father and son, and ultimately the son was precluded from receiving the benefits which he was privy to in the past. Now the son comes into court, seeking to stop essentially the same types of transactions from which he once benefited from being provided to his siblings. In so doing, the son seeks either to liquidate the corporations in question, force the defendants to buy out his interests in the corporations, or force a dividend for the pro rata amount of the alleged fraudulent transfers. Thus, notwithstanding the debts acknowledged, the son seeks to use the powers of the court to benefit himself directly for actions essentially identical in nature to acts in which he participated. The unclean hands doctrine was established to prevent just this type of scenario.

However, the son also brings this complaint on behalf of various corporations for which he is a valid shareholder. In so doing, the son acknowledges that he is also indebted to various of these corporations for the same types of transactions that he now seeks to stop. Thus, the equitable doctrine of unclean hands need not prevent the son from acting in his role as shareholder on behalf of the corporation in this shareholder derivative suit seeking to recover fraudulently transferred or wasted corporate assets. Any indirect benefit to the son is permissible because the true beneficiaries are the corporations.

Plaintiff's attempt to distinguish the transactions on the facts or negate their preclusive effect by acknowledging their existence and pledging their repayment upon recovery is unavailing. The son wants the court to discount any benefits he received as a member of the West family and focus on his treatment as a shareholder in the West family corporations. These benefits should be dis-

counted because there was either a valid business or other justification supporting them or the plaintiff acknowledges the benefits as a debt owed to the defendants. Yet, plaintiff's contentions omit the key point in the argument that but for his membership in the West family, these benefits never would have been passed on to him, regardless of the underlying reasoning supporting the acts.

It is for this reason that plaintiff's argument that any finding of unclean hands must relate directly to the acts alleged in his complaint is also unavailing. The acts themselves are merely the end result of the true basis for this action, that Charles, Sr., as controlling head of the West family corporations, gave preferential treatment to his other children in the form of corporate assets while excluding plaintiff from receiving those same benefits. Plaintiff never argues that his brothers and sisters ever had any bad intent or committed any wrong by participating in the transactions at issue. If plaintiff had been permitted to continue receiving the same types of benefits, this action would never have been brought. Therefore, the court cannot simply focus on the acts in plaintiff's complaint and find that plaintiff's hands are clean with regard to those acts.

The question is whether or not plaintiff has clean hands in attempting to bring an action to recover his pro rata share of distributions of corporate assets made by the West family corporations in preferential transfers resulting from the beneficiary status as a West family member. The court finds that plaintiff does not have clean hands. The very fact that plaintiff knowingly accepted and received preferential treatment from the West family corporations is the cause of plaintiff's unclean hands. The clearest example that plaintiff personally benefited from the same types of loan transactions which he alleges in support of his complaint is the fact that as of January 31, 1989, plaintiff has received a

personal benefit from the various West family entities of approximately $1,000,089 in principal and $514,028 in accrued interest, for a total of $1,514,117 in outstanding loans and payments made on plaintiff's behalf.[30]

Plaintiff's attempt to refocus the case onto his rights as a shareholder is nothing but a masked attempt to get the court to do what he cannot: Make his father give up control of the family corporations and thereby obtain a direct recovery of the value of his interests in the family corporations now, rather than at some future unknown date of his father's choosing, or when he rightfully receives control of those assets held in trust for him. The court notes that there is nothing inherently improper or illegal about the West family corporate structure. Many parents and grandparents seek to set up a system whereby they can pass on the family businesses to their children in a clean and equitable fashion while maintaining firm control of the family business until the head of the family determines otherwise. While exercising control, however, the father may not improperly waste corporate assets which thereby adversely impacts the value of all shareholders' interests.

Plaintiff David West is found to have unclean hands, such that any direct recovery, forced liquidation, or forced sale from Charles, Sr. or the West Corporations is prohibited. Counts One and Two of plaintiff's complaint are DISMISSED. However, by acknowledging his obligations and stipulating to the set-off of these debts, David has sufficiently cleansed his hands to permit the pursuit of a shareholder derivative action on behalf of the West family corporations. Therefore, plaintiff's motion for partial summary judgment concerning affirmative defenses is GRANTED IN PART and DENIED IN PART; as is defendants' cross motion for summary judgment concerning affirmative defenses.

---

30. *See* Exhibit 4 *infra.* These figures represent the court's findings taken from estimates made by the defendants and often contested by the plaintiff. *See* Plaintiff's Consolidated Brief in Response to Defendants' Motion for Summary Judgment on the Affirmative Defenses of Estoppel and Unclean Hands and Reply Brief in Support of Plaintiff's Motion for Partial Summary Judgment, Exhibit A at 1. The court acknowledges that these figures are only approximations. In fact, the figures only are alleged to be current as of January 31, 1989. However, these figures do aptly illustrate the personal benefit received by plaintiff from the various West family corporations.

### B. *Direct Recovery*

In count one of plaintiff's amended complaint, plaintiff seeks a direct and personal recovery of monetary damages from his father, Charles B. West, Sr., who acted in his official capacity as chairman of the various West family corporations. In this capacity, Charles, Sr. allegedly approved or otherwise permitted certain transactions which constituted the wasting and misappropriation of corporate assets of the various West family corporations. In count two of plaintiff's amended complaint, plaintiff seeks the involuntary liquidation of appropriate West family corporations pursuant to former O.C.G.A. § 14-2-285 or, in the alternative, for the court to issue an order directing the various West family corporations or Charles B. West, Sr. personally to purchase plaintiff's stock ownership in the West family principal corporations.

Defendants have moved for summary judgment as to count one of plaintiff's amended complaint on the grounds that plaintiff's claims for breach of fiduciary duty as a result of the fraudulent transfer or wasting of corporate assets must be brought as a derivative action on behalf of the corporations and precludes any direct or personal recovery to plaintiff. Defendants seek summary judgment as to count two of plaintiff's amended complaint on the grounds that forced liquidation of any West family corporations is an inappropriate remedy which is far too drastic to be imposed based upon the undisputed facts present in this case. Further, defendants argue that plaintiff's alternative remedy of the forced purchase of all outstanding stock in the various West family corporations directly owned by plaintiff is not permissible pursuant to Georgia law.

The court need not reach the merits of defendants' motion for summary judgment as to counts one and two of plaintiff's amended complaint because the court finds that plaintiff's unclean hands preclude any direct recovery to plaintiff.[31] Equitable doctrines dictate that on the facts present plaintiff is barred from seeking any direct recovery from defendants, or from forcing the liquidation of the various West family corpora-

tions for which plaintiff owns stock, or forcing the defendants to purchase back said stock. However, equity does not preclude plaintiff from bringing a derivative action on behalf of the corporations in question. Thus, defendants' motion for summary judgment as to counts one and two is GRANTED.

### C. *Derivative Action*

In counts three and four of plaintiff's amended complaint, plaintiff seeks recovery on behalf of three West family corporations against Defendant Charles B. West, Sr., for the alleged waste and fraudulent transfer of corporate assets in violation of Charles Sr.'s fiduciary duties. Defendants seek partial summary judgment as to various aspects of counts three and four of plaintiff's complaint. Defendants seek partial summary judgment concerning plaintiff's derivative claims based upon transactions involving First Republic Company, the West Corporation and Belvoir Properties, Inc. (hereinafter "BPI"), arguing that plaintiff fails as a matter of law to satisfy the stock ownership requirements of former O.C.G.A. § 14-2-123 with respect to those corporations and, therefore, lacks standing to bring a derivative action on behalf of those corporate entities. Further, defendants argue that partial summary judgment as to all derivative claims involving West Equipment Company is warranted because the undisputed facts show that plaintiff cannot establish any basis which supports plaintiff's derivative claims with respect to the transactions involving West Equipment.

### 1. *Double Derivative Action*

Defendants argue that plaintiff does not have standing to bring derivative actions on behalf of West Corporation and First Republic Corporation in counts three and four of plaintiff's amended complaint because plaintiff fails to satisfy the dual requirements of former O.C.G.A. § 14-2-123 that he be a shareholder for each of those two corporations, both at the time the alleged fraudulent transactions occurred and at the time of the filing of the complaint. Further, defendants argue that plaintiff cannot meet the shareholder standing requirements by pleading a

---

**31.** *See* discussion section II(A) *supra* at 1042.

"double derivative" action. Defendants argue that,

> [t]he "double derivative" concept simply does not extend as a matter of law to permitting the stockholder of a corporation which is a non-controlling partner in a partnership owning stock in other corporations to assert derivative claims on behalf of the later entities, nor can the principle be stretched to confer standing upon the beneficiary of trusts holding small interest in the same partnership.[32]

Defendants further argue that plaintiff's argument in support of a court finding permitting a double derivative action would effectively "ignore the undisputed facts regarding his stock ownership and ... disregard lawfully recognized distinctions between and among various West organizations and corporations in favor of some unprecedented super-derivative action involving a monolithic entity known as the 'West family corporations.'" Defendants contend that there is no reason in this case to create a "close family corporation" or "integrated enterprise" exception to the unambiguous standing requirements of Georgia law. Creating such an exception and permitting plaintiff to pursue his derivative claims on behalf of Westcorp and First Republic would "represent an unprecedented extension of the existing limits of standing under Georgia law for stockholder derivative suits." *See* Defendant's Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment as to Counts One and Two and for Partial Summary Judgment as to Counts Three and Four of Plaintiff's Amended Complaint at 25.

■ Plaintiff argues that pursuant to Fed. R.Civ.P. 23.1, plaintiff is entitled to pursue a double derivative action on behalf of Westcorp and First Republic.[33] Further, plaintiff argues that the issue of whether federal or state law governs the standing of a shareholder to sue derivatively under Fed.R.Civ.P. 23.1 in a diversity case is controlled by federal law. However, even assuming that state law applies, defendant argues that former O.C.G.A. § 14–2–123 can be interpreted as permitting double derivative actions because such a claim would qualify as "a claim or cause of action which the representatives of the corporation, in violation of their duties, have failed to enforce." Former O.C.G.A. § 14–2–123(a).

These issues appear to be questions of first impression in this circuit. The Eleventh Circuit Court of Appeals has not addressed the issue whether federal or state law governs the standing of a shareholder to sue derivatively pursuant to Fed.R.Civ.P. 23.1 in a diversity action. Nor are there any Georgia cases which address or even mention the concept of a double derivative action and the appropriate standing requirements for such an action under Georgia law.

The initial question in determining plaintiff's standing to bring a double derivative action on behalf of First Republic and Westcorp is who is a "shareholder" within the meaning of Fed.R.Civ.P. 23.1. There is a general conflict within pertinent case law as to whether a plaintiff must be a shareholder of record or whether mere equitable ownership, not of record, is sufficient to pursue a derivative action. *See* 3B *Moore's Federal Practice* ¶ 23.1.17 at 63.

■ The court finds that where the claims are based upon state substantive law, state law should apply. *See Brown v. Ferro Corp.,* 763 F.2d 798, 802–803 (6th Cir.); *cert. denied,* 474 U.S. 947, 106 S.Ct. 344, 88 L.Ed.2d 291 (1985) ("[s]hareholder derivative actions are governed by Rule 23.1 ..., and federal courts apply the law of the state in which the company is incorporated") (citing *Burks v.*

---

**32.** Defendants allege that plaintiff is actually attempting to bring a shareholder derivative suit on behalf of corporation A because he holds shares in corporation B, which has a minority partnership interest in a partnership holding company, which in turn owns shares in corporation A.

**33.** A double derivative action permits a shareholder to maintain a derivative action on behalf

of corporations in which the shareholder does not own stock directly so long as the rights he seeks to enforce are those of a corporation in which a corporation for which plaintiff does directly own stock has a shareholder's interest in the corporation containing the rights sought to be enforced. 3B *Moore's Federal Practice* ¶ 23.-1.16[1].

*Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979)); *Drachman v. Harvey*, 453 F.2d 722, 726–27 (2d Cir.1971), *modified en banc*, 453 F.2d 736 (1972); *de Haas v. Empire Petroleum Co.*, 435 F.2d 1223, 1227–28 (10th Cir.1970); *Norton v. Nat'l Research Foundation*, 141 F.R.D. 510, 512 (D.Kan. 1992). Where the claim is not based upon state law, however, the question of who is a "stockholder" and thereby has standing to pursue a derivative suit should be referred to federal substantive law. *Id.* The court notes that there is a split in the circuits on this issue, with the Second, Sixth and Tenth Circuits holding that state substantive law applies in diversity cases, whereas the Seventh Circuit holds that the issue is a procedural question to be decided by federal law. *Compare Brown*, 763 F.2d at 802–803; *Drachman*, 453 F.2d at 726–27 *and de Haas*, 435 F.2d at 1227–28 *with H.F.G. Co. v. Pioneer Publishing Co.*, 162 F.2d 536, 539–40 (7th Cir.1947); *Edgeworth v. First Nat'l Bank of Chicago*, 677 F.Supp. 982, 991, 991 n. 5 (S.D.Ind.1988).

■ Thus, in the case *sub judice*, a diversity action, the definition of shareholder is a substantive question and, therefore, determined pursuant to state law. *See Brown*, 763 F.2d at 802–03; *Drachman*, 453 F.2d at 726–27; *Norton*, 141 F.R.D. at 512. This analysis represents the better reasoned position taken by the majority of the federal courts. *See* 3B *Moore's Federal Practice* ¶ 23.1.17 at 65. Further, this analysis complies with traditional conflict-of-law rules appropriate in diversity jurisdiction cases. *Mansfield Harwood Lumber Co. v. Johnson*, 268 F.2d 317, 319 (5th Cir.) (per curiam), *cert. denied*, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959) (citing *Klaxton Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941)).[34] Therefore, pursuant to Georgia law the plaintiff, in order to bring a shareholder derivative suit, must be a shareholder of record at the time the action is brought and at the time

the transactions contained in the complaint occurred. O.C.G.A. §§ 14–2–2(12) and 14–2–123.

■ The second question which must be resolved is in which corporation must the plaintiff be a shareholder of record—the corporation which holds the rights sought to be enforced or a subsidiary corporation. The general rule under existing federal case law is that double or multiple derivative actions are permissible. *See, e.g., Blasband v. Rales*, 971 F.2d 1034, 1042–1043 (3d Cir.1992); *Goldstein v. Groesbeck*, 142 F.2d 422, 425 (2d Cir.1944), *cert. denied*, 323 U.S. 737, 65 S.Ct. 36, 89 L.Ed. 590 (1944); *Untermeyer v. Valhi, Inc.*, 665 F.Supp. 297, 299 (S.D.N.Y. 1987); *Kennedy v. Nicastro*, 517 F.Supp. 1157, 1161 (N.D.Ill.1981); 3B *Moore's Federal Practice* ¶ 23.1.16[1] at 39–40. No Eleventh Circuit or Georgia state law case discusses the appropriateness of double derivative actions.[35] Nor does Georgia statutory authority to bring a derivative action, former O.C.G.A. § 14–2–123, either specifically permit or preclude double derivative actions. However, the one Eleventh Circuit case which mentions a double derivative action does so citing *Goldstein*, thereby impliedly noting with approval the controlling federal precedent which permits double derivative actions. *See Belcher v. Grooms*, 406 F.2d 14, 16 n. 3 (5th Cir.1968). Thus, the court finds that the general federal rule permitting multiple derivative actions is the law of this circuit, and that on the facts present a multiple derivative action is warranted.

■ Further, the purpose for requiring that a plaintiff be a shareholder of record was to provide "adequate protection against strike suits without unduly restricting shareholders who seek in good faith to vindicate a wrong suffered by their corporation." *Id.* Thus, because the court finds that plaintiff is not attempting to initiate a strike suit, and because the general rule permits the bring-

---

34. The Eleventh Circuit, in the *en banc* decision of *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981 unless overruled *en banc*.

35. In fact, the court can find no Georgia state court case which even mentions double derivative actions and can only find one Eleventh Circuit case which even mentions a double derivative action. *See Belcher v. Grooms*, 406 F.2d 14, 16 (5th Cir.1968).

ing of a multiple derivative action, the court holds that an appropriate shareholder of record may bring a multiple derivative action pursuant to Georgia law concerning derivative actions contained in former O.C.G.A. § 14–2–123.

■ The fact that the corporation of which plaintiff is a shareholder is not a parent corporation of the corporation which has the rights that are sought to be enforced does not change the court's analysis. The normal double derivative suit involves a plaintiff bringing suit based upon stock ownership in a parent corporation and thereby seeking to enforce the rights of the subsidiary corporation. *See* Wright, Miller & Kane, *Federal Practice and Procedure:* Civil 2d § 1826 at 48–49. In this case plaintiff is a minority shareholder of a corporation which in turn is a minority shareholder of the corporation whose rights are sought to be enforced. The court finds this fact immaterial given the same centralized control maintained by Charles, Sr. over all West family corporations.

This position is supported by the general purpose that is intended to be promoted by permitting a derivative or multiple derivative action. In permitting a double or multiple derivative action, the court should consider whether or not the shareholder of record has a valid interest in the rights that are not being enforced by the derivative corporation; and that control of both the corporation for which the party bringing the claim is a stockholder of record and the corporation which maintains the rights sought to be enforced is maintained by the same entity; and, therefore, the aforementioned rights will go unenforced absent an action brought derivatively by a shareholder. *See In re Rodriguez*, 895 F.2d 725, 729 (11th Cir.1990) (evidence of inequity or injustice will justify piercing of corporate veil); *Hirshhorn v. Mine Safety Appliances Co.*, 54 F.Supp. 588, 592 (D.C.Pa. 1952) ("[t]o effect substantial justice, equity will pierce the corporate veil, especially when the affairs of the parent and its subsidiaries are so interwoven as to dictate the penetration").

Here, plaintiff clearly has an indirect interest in First Republic and Westcorp through his direct stock ownership in the three other principal West family corporations.[36] Further, the control of all of the principal West family corporations is maintained in Charles, Sr., in his role as chairman of each of these corporations. Therefore, unless a minority shareholder is permitted to bring derivative claims, the rights held by the derivative corporations to recoup the losses from the alleged fraudulent transfers and wasting of corporate assets will not be pursued.

■ In the case *sub judice*, plaintiff may clearly bring a double derivative action on behalf of Westcorp because plaintiff directly owns stock in West Enterprises which in turn owns stock in Westcorp. Bringing a double derivative action on behalf of First Republic is slightly more complicated because plaintiff maintains an indirect stock interest in First Republic only by way of the interlocking partnership interest held in West Investment. The court finds, however, that to preclude a double derivative action, because the various corporate entities have placed their interlocking ownership interests into a holding partnership, would be to put form over substance. The entire basis of a double derivative action is to permit the piercing of the corporate veil where the control of the entities in question is maintained by the same body.

Thus, plaintiff will be permitted to bring a double derivative action on behalf of First Republic. Although the court notes that permitting a double derivative action pursuant to Georgia law is a substantial expansion on existing case law, the court believes that such a holding does not require any expansion of the underlying principles which form the basis of such derivative actions and are intended to be promoted by the court permitting a derivative action of any type.

### 2. West Equipment Company Derivative Action

Defendants allege that plaintiff has failed as a matter of law to establish any basis for derivative recoveries on behalf of West Equipment Company. Because the undis-

---

**36.** *See* discussion *supra* section II(B) at 1052; *see*   *also* Exhibit 1.

puted facts with respect to these six transactions in question show that there is no evidence in support of plaintiff's allegations, the defendants assert that West Equipment should be dismissed from this litigation. Plaintiff argues that the transactions in question do represent a wasting or misappropriation of corporate assets and that there is sufficient record evidence to support the claims regarding each transaction.

■ After reviewing the parties' briefs and the record evidence in support of their contentions, the court finds that there is a dispute of material fact as to whether the transactions in question occurred or do not represent waste or misappropriation of corporate assets as a matter of law. Therefore, plaintiff will be permitted to pursue his claims against West Equipment Company at trial.

### D. *Motion to Amend the Complaint*

■ Plaintiff seeks leave of the court to file a third amended complaint pursuant to Fed.R.Civ.P. 15.[37] In addition, pursuant to Fed.R.Civ.P. 21, plaintiff seeks to add seven additional parties to this suit.

Plaintiff's third amended complaint specifically details, per this court's prior order, all transactions which plaintiff alleges represent fraudulent transfers or the wasting of corporate assets in violation of the corporation's officers or directors' fiduciary duties as detailed in former O.C.G.A. §§ 14–2–123 and 14–2–153. The fifty-two specific transactions detailed in plaintiff's third amended complaint, with minor modifications, merely represent a compilation in proper pleading form of the transactions which plaintiff relies on in support of his claims and which were previously presented in plaintiff's two letter amendments dated July 17, 1989 and June 8, 1990. Further, plaintiff seeks to assert a new statutory claim for counts three and four under former Georgia Business Corporation Code § 14–2–154. Finally, plaintiff seeks to add a new theory of relief under the derivative claims in counts three and four of plaintiff's complaint. Defendants object to all amendments to plaintiff's complaint, with the exception of the compilation of transactions which allegedly represent fraudulent transfers upon which plaintiff's complaint is based. The court will address these issues *seriatim.*

### 1. *Request to Add Parties*

Plaintiff's third amended complaint seeks to add seven new parties to the suit aligned as defendants. These parties are all various corporations controlled by the West family. Specifically, these corporations are: First Republic Company (First Republic); The West Corporation (Westcorp); Associated Distributors, Inc. (Associated Distributors); West Cash & Carry Building Materials of Macon, Inc.; West Cash & Carry Building Materials of Montgomery, Inc.; West Cash & Carry Building Materials of McComb, Inc.; and Belvoir Properties, Inc. Both First Republic and Westcorp are principal corporations within the West family corporate structure and have been discussed *supra.* Associated Distributors is a wholly-owned subsidiary of Defendant West Lumber Company. The three West Cash & Carry corporations are wholly-owned subsidiaries of Associated Distributors. West Cash & Carry Building Materials of Macon, Inc., operates all of the West retail facilities in Georgia. West Cash & Carry Building Materials of Montgomery, Inc., operates all of the West retail facilities in Alabama. West Cash & Carry Building Materials of McComb, Inc., operates all of

---

**37.** The decision whether to grant leave to amend a pleading lies within the sound discretion of the trial court. *Gramegna v. Johnson,* 846 F.2d 675, 678 (11th Cir.1988); *Stephens v. Gay,* 864 F.2d 113, 116 (11th Cir.1989). Because Rule 15(a) envisions liberal allowance of amendments to pleadings, there must be some substantial reason justifying denial of the motion. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Nolin v. Douglas County,* 903 F.2d 1546 (11th Cir.1990); *Shipner v. Eastern Air Lines, Inc.,* 868 F.2d 401, 407 (1989). A court may consider factors such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [and] futility of amendment" in reaching its decision. *Nolin,* 903 F.2d at 1550 (quoting *Foman,* 371 U.S. at 182, 83 S.Ct. at 230). *See Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1041–42 (11th Cir.1986) (motion to amend denied where proposed amended complaint failed to state a claim); *Haliburton & Associates, Inc. v. Henderson, Few & Co.,* 774 F.2d 441, 444 (11th Cir.1985).

the West family facilities in Mississippi. Belvoir Properties, Inc., is a wholly-owned subsidiary of Westcorp.

Plaintiff seeks to add these additional parties because plaintiff has determined through discovery that many of the transactions which form the basis of plaintiff's claims were not carried out by the originally-named defendant corporations, but were actually carried out by these affiliated corporations or subsidiary corporations. Plaintiff alleges that all of these affiliated or subsidiary corporations were within the defendants' ownership and control.

Defendants object to the admission of these additional parties insofar as plaintiff seeks to add these parties in order to assert derivative claims on their behalf pursuant to former O.C.G.A. § 14–2–123. Defendants argue that plaintiff cannot meet the requirements of former § 14–2–123(b), that plaintiff be a stockholder of record, and, therefore, plaintiff cannot set forth a cognizable claim under the circumstances of this case concerning these additional parties. However, as previously discussed in *supra* section II(C)(1), the court finds that plaintiff has met the standing requirements necessary to plead a derivative and/or double derivative action on the facts present.

This analysis only addressed double derivative actions concerning First Republic and Westcorp but is equally applicable with regard to the other West corporations which plaintiff seeks to add. The fact that these additional corporations are wholly-owned subsidiaries of corporations in which plaintiff has viable interests presents a cleaner foundation on which to permit a derivative action because this represents the typical situation where the court permits double derivative actions. *See* Wright, Miller & Kane, *Federal Practice and Procedure:* Civil 2d § 1826 at 48–49. The court recognizes, in the case of the three West Cash & Carry corporations and Belvoir Properties, Inc., that the court is permitting triple derivative actions to occur. Nonetheless, the court finds that the purposes and principles which permitted plaintiff to pursue a double derivative action equally apply to a derivative action involving these

corporations and thereby justify their addition as party defendants. *Kaufman v. Wolfson*, 132 F.Supp. 733, 735 (D.C.N.Y.1955) (permitting triple derivative actions); *see also* Wright, Miller & Kane, *Federal Practice and Procedure:* Civil 2d § 1826 at 49; 3B *Moore's Federal Practice* ¶ 23.1.16[1] at 40.

### 2. *New Statutory Claim*

Plaintiff seeks to amend his complaint in order to provide that count four's shareholder derivative claim is brought pursuant to former O.C.G.A. § 14–2–154.

Defendants object to what they argue is plaintiff's untimely and prejudicial attempt to add a new statutory claim with a longer statute of limitations. Defendants argue that because the underlying transactions asserted in either the second amended complaint or third amended complaint remain the same, that plaintiff is merely attempting to apply a six-year statute of limitations to his derivative claims instead of the previously applicable four-year statute of limitations. Further, this alteration of the scope of the case is fundamental, material and prejudicial. In addition, defendants argue that any amendment to plaintiff's complaint incorporating claims brought pursuant to former § 14–2–154 have no relevance to the circumstances of this case, as the remedies provided pursuant to that code section essentially involve corporate finance governance provisions concerning the issuance of dividends or other distributions concerning issues such as insolvency, priority of dividends and capital surplus. Therefore, the amendment to plaintiff's complaint in question would be futile.

Defendants also argue that any amendment of plaintiff's claims pursuant to former § 14–2–154 would unduly complicate and burden this litigation. Specifically, former § 14–2–154 contains provisions which impose liability upon any director jointly and severally but then provides that any director found liable will have rights of contribution from any shareholder or other director who benefited from the inappropriate dividend or distribution of assets. Therefore, the cur-

rent defendants would have to pursue claims against the other corporate shareholders and directors, which in turn would greatly expand the scope of this litigation.

According to plaintiff his third amended complaint makes it clear that count four is brought pursuant to the provisions of former O.C.G.A. § 14–2–154, which has a six-year statute of limitations. There is no change in the underlying allegations which form the basis of the cause of action. Plaintiff argues that there is no case law indicating the restrictive interpretation promoted by the defendants. The statute clearly states that the provisions of § 14–2–154 apply to the entire chapter and, therefore, include those provisions contained in § 14–2–152.

■ The court holds that, notwithstanding the fact that plaintiff seeks to amend his complaint rather than merely clarify his prior pleadings, plaintiff will be permitted to amend his complaint in order to pursue claims pursuant to O.C.G.A. § 14–2–154. Leave to amend shall be given unless the claims sought to be pursued would be futile or require additional discovery. *See* Fed. R.Civ.P. 15(a).

Here, plaintiff has contended that only the underlying transactions already alleged will form the basis of any claims brought pursuant to former § 14–2–154. Thus, the additional two-year statute of limitations in no way modifies, enlarges or alters the underlying transactions which form the basis of this complaint. Nor will the defendants be prejudiced by the six-year statute of limitations contained within § 14–2–154 because only those transactions already alleged will form the basis of the new claim. In fact, defendants have admitted that they do not object to plaintiff's motion to amend to the extent it merely incorporates and compiles the underlying transactions in support of plaintiff's complaint contained in the two letter amendments previously submitted. However, the court notes that it will not permit plaintiff to amend his complaint further to allege new

underlying transactions absent the most compelling of circumstances.

Finally, although the comment to § 14–2–154 directs the party to look at §§ 14–2–90 and 14–2–91 when considering claims brought pursuant to § 14–2–154, nothing in either the comment or any case law indicates that the statute should be interpreted as to apply only to those provisions rather than the entire chapter as explicitly contained in the statute. Here, the explicit language in the statute must control absent clear intent to the contrary. Thus, the court cannot say that plaintiff's claims are futile.

Leave to amend plaintiff's complaint to include claims pursuant to O.C.G.A. § 14–2–154 is GRANTED.

### 3. *New Theory of Relief.*

In counts three and four of plaintiff's proposed third amended complaint, plaintiff seeks to add a new theory of relief. Specifically, plaintiff requests that the court declare as "dividends" of each of the West corporate entities any amounts received or otherwise fraudulently transferred or misappropriated by Charles B. West, Sr. Further, plaintiff requests that Charles, Sr. be required to pay to plaintiff that portion of such dividends which plaintiff is entitled to as a result of his stock ownership in the West corporate entities in question.

Because the court has already determined that plaintiff is prohibited from pursuing any direct recovery in the case *sub judice* as the result of his participation in similar transactions and resulting unclean hands, plaintiff's motion to amend his complaint in order to recover a direct dividend is DENIED.[38]

### 4. *Summary.*

Plaintiff is DIRECTED to file with the court within twenty (20) days of the entry of this order, a third amended complaint consistent with the court's aforementioned discussion. Specifically, plaintiff should compile the list of transactions contained in the two prior letter amendments, incorporate the additional parties permitted to be added, and

---

**38.** *See supra* discussion section II(A) at 1042.

incorporate the new statutory claim pursuant to former O.C.G.A. § 14-2-154. No additional transactions or theory of relief should be incorporated in the third amended complaint.

### E. *Motion to Reconsider*

Plaintiff moves for reconsideration of this court's order entered on January 15, 1991, denying plaintiff's motion for judgment on the pleadings concerning the affirmative defenses of unclean hands and estoppel. Plaintiff argues that the court's order overlooks the distinction set forth in case law between misconduct in which the plaintiff allegedly participated and misconduct in which he clearly did not. Plaintiff argues that the doctrines of estoppel or unclean hands apply only when the plaintiff receives the same benefit at the same time as the defendants against whom equitable relief is sought.

The court finds on the facts of this case that plaintiff's arguments are untenable. As previously discussed in section II(A), *supra*, the court finds that plaintiff comes into court with unclean hands regarding the transactions at issue. Specifically, plaintiff's unclean hands result from his receiving the same preferential treatment and benefits from the West family corporations as a result of being a member of the West family.

## III. CONCLUSION

A court of law is normally not an appropriate forum to resolve father and son disputes over the use of family corporate assets and the son's rights to such assets. This case is no exception. Nonetheless, when put in the context of a minority shareholder's rights to be fairly treated and to prevent the wasting of corporate assets, the court has a duty to the corporations, as well as the shareholder. Therefore, the court finds that fairness and the interests of justice are best served by determining all acts that were in fact a wasting of corporate assets and then requiring the benefiting parties to make the corporations whole. The parties may then resolve their personal disputes among themselves.

Therefore, plaintiff's motion for leave to file a third amended complaint [416-1] is GRANTED IN PART and DENIED IN PART. Plaintiff is DIRECTED to file with the court within twenty (20) days of the entry of this order, a third amended complaint which provides a specific list of the transactions relied on by plaintiff and contained in the two prior letter amendments; add the additional approved corporate defendants; and incorporate the new statutory claim brought pursuant to former O.C.G.A. § 14-2-154. Plaintiff's motion for reconsideration of the court's order entered on January 15, 1991 [429-1] is DENIED. Plaintiff's motion for partial summary judgment concerning affirmative defenses [421-1] is GRANTED IN PART and DENIED IN PART. Defendants' cross motion for summary judgment concerning affirmative defenses [425-1] is GRANTED IN PART and DENIED IN PART. Defendants' motion for summary judgment as to counts one and two of plaintiff's complaint [422-1] is GRANTED. Defendants' partial motion for summary judgment as to counts three and four of plaintiff's complaint [422-2] is GRANTED IN PART and DENIED IN PART. Counts one and two of plaintiff's complaint are dismissed.

SO ORDERED.

EXHIBIT 1

*David West's Ownership Interests
In the Principal West Family Corporations*

A table of David's beneficial ownership interests in the principal West family corporations, including David's direct, indirect and beneficiary trust interests, shows that on the following dates David had a percentage ownership interest of:

| | 12/31/84 | 12/31/85 | 12/31/86 | 12/31/87 | 7/25/88 |
|---|---|---|---|---|---|
| West Lumber | 7.99 | 8.09 | 8.03 | 6.77 | 4.05 |
| West Enterprises | 7.97 | 8.08 | 7.97 | 7.76 | 7.66 |
| West Equipment | 27.42 | 28.13 | 28.45 | 28.34 | 28.30 |
| First Republic | 4.70 | 4.76 | 4.70 | 4.47 | 4.15 |
| Westcorp | 4.44 | 4.70 | 4.64 | 4.42 | 4.12 |

*See* Plaintiff's Statement of Material Facts in Response to Defendants' Motion for Summary Judgment as to Counts One and Two of Plaintiff's Complaint and for Partial Summary Judgment as to Counts Three and Four at 3. *See also* Plaintiff's Exhibits 2–5 of the Deposition of Mr. James N. Bearden.

EXHIBIT 2

*Estimated Off–Set Liabilities of Plaintiff*

A summary of the various liabilities owed by plaintiff to defendants by transaction and entity as of January 31, 1989 shows:

| Date of Loan or Balance as Of | Description | Interest Rate | Principal | Accrued Interest | Total |
|---|---|---|---|---|---|
| 7/31/87 | Advance from West Equipment to pay Georgia Payroll Taxes | Prime plus 1% | 9,896 | 1,554* | 11,450 |
| 7/15/87 | Salary paid to David as President of West Equipment | Prime plus 1% | 20,000 | 4,135* | 24,135 |
| 6/30/87 | Purchase of NBG Note from Westcorp by West Equipment | Prime plus 1% | 70,394 | 11,408 | 81,802 |
| 5/8/87 | Advance from West Equipment to pay expenses | Prime plus 1% | 150,000 | 27,327* | 177,327 |
| 1/24/77 | Loan from CBW, Sr. | 8% | 120,000 | 183,067 | 303,067 |
| GRAND TOTAL | | | $370,290 | 227,491 | 597,781 |

*Summary of Accounts Due by Entity*

| Company | Total |
|---|---|
| West Equipment Company | $294,714 |
| Charles B. West, Sr. | 303,067 |
| GRAND TOTAL | $597,781 |

*—Means the interest rate used is contested by plaintiff.

EXHIBIT 3

*Estimated Personal Benefit to Plaintiff*

A summary, determined by the court, of the various personal benefits received by plaintiff from defendants by transaction and entity as of January 31, 1989 shows:

| Date of Loan or Balance as Of | Description | Interest Rate | Principal | Accrued Interest | Total |
|---|---|---|---|---|---|
| 7/31/87 | Advance from West Equipment for GA Payroll Taxes | Prime plus 1% | 9,896 | 1,554* | 11,450 |
| 7/15/87 | Salary paid to David as President of West Equipment | Prime plus 1% | 20,000 | 4,135* | 24,135 |
| 6/30/87 | Purchase of NBG Note from Westcorp by West Equipment | Prime plus 1% | 70,394 | 11,408 | 81,802 |
| 5/8/87 | Advance from West Equipment to pay expenses | Prime plus 1% | 150,000 | 27,327* | 177,327 |
| 1/6/86 | Paces Ferry Development Note— West Equipment | Prime plus 1% | 594,000 | 192,942* | 786,942 |
| 8/3/79 | Davidson Land One owed to West Enterprises (50% of loss plus interest) | 8% | 255,799 | 276,662* | 532,461 |
| 1/24/77 | Loan from CBW, Sr. | 8% | 120,000 | 183,067 | 303,067 |
| GRAND TOTAL | | | 1,220,089 | 697,095 | 1,917,184 |

*Summary of Accounts Due by Entity*

| Company | Total |
|---|---|
| West Equipment Company | $1,081,656 |
| West Enterprises, Inc. | 532,461 |
| Charles B. West, Sr. | 303,067 |
| GRAND TOTAL | $1,917,184 |

*—Means the interest rate used is contested by plaintiff.

## ADDENDUM

The attached Exhibit 4 was omitted from the court's order of September 30, 1992 in the above-captioned case.

## EXHIBIT 4

*Georgia Statutory Authority*

*Former O.C.G.A. § 14–2–1*

"This chapter shall be known and may be cited as the 'Georgia Business Corporation Code.'"

*Former O.C.G.A. § 14–2–2(12)*

Former O.C.G.A. § 14–2–2(12) defines a shareholder to be "one who is a holder of record of shares in a corporation."

*Former O.C.G.A. § 14–2–123*

The statutory authority to bring a derivative action in Georgia was found in Former O.C.G.A. § 14–2–123, which reads in pertinent part:

(a) A derivative action may be brought by a shareholder in the right of the corporation to procure a judgment in its favor against directors, officers, or other representatives of the corporation, or shareholders or third parties, or any combination thereof, whenever the corporation has a claim or cause of action which the representatives of the corporation, in violation of their duties, have failed to enforce, including a claim or cause of action against such representatives for their failure in this respect.

(b) In a derivative action brought by one or more shareholders . . ., the complaint shall be verified and shall allege that the plaintiff is a shareholder of record or a member at the time of bringing the action. It shall further allege:

(1) That the plaintiff had purchased his shares and was a shareholder of record or member at the time of the transaction of which he complains or that his shares or membership thereof devolved on him through one or several transactions by operation of law from one who was a shareholder of record or member at such time; or

(3) That the plaintiff is the holder of record of shares which, at the time of the transaction of which he complains, were held of record by a trustee of a voting or other trust in which the plaintiff held a beneficial interest or in which a beneficial interest was held by one from whom the shares have devolved upon the plaintiff through one of several transfers by operation of law.

(e) If such action is successful, in whole or in part, or if anything is received by the plaintiff or plaintiffs as the result of the judgment, compromise, or settlement thereof, the court may award the plaintiff or plaintiff's reasonable expenses, including reasonable fees of attorneys, and shall direct him or them to account to the corporation for the remainder of the proceeds so received by him or them.

(f) In any such action instituted after April 1, 1969, the court having jurisdiction, upon final judgment finding that the action was brought without reasonable cause, may require the plaintiff or plaintiffs to pay to the parties named as defendants the reasonable expenses, including fees of attorneys, incurred by them in the defense of such action.

*Former O.C.G.A. § 14–2–152*

Former O.C.G.A. § 14–2–152 details the standard of care which directors and officers of a corporation shall abide by in discharging their duties and states in pertinent part:

Directors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care, and skill which ordinarily pru-

dent persons would exercise under similar circumstances and like positions.

### Former O.C.G.A. § 14–2–152.1

Former O.C.G.A. § 14–2–152.1 dictates the standard of care applicable for directors and officers for their actions occurring on or after July 1, 1987. Section 152.1 reads in pertinent part:

(a)(1) A director shall discharge his duties as a director, including his duties as a member of a committee:

(A) In good faith; and

(B) With the care an ordinarily prudent person in a like position would exercise under similar circumstances.

### Former O.C.G.A. § 14–2–153

Actions may be brought against directors and officers of a corporation pursuant to Former O.C.G.A. § 14–2–153. Section 14–2–153 reads in pertinent part:

(a) An action may be brought by any of the persons named in subsection (b) of this Code section against one or more directors or officers of a corporation to procure for the benefit of the corporation a judgment for the following relief:

(1) To compel the defendant to account for his official conduct or to decree any other relief called for by his official conduct in the following cases:

(A) The neglect of, failure to perform, or other violation of his duties in the management of the corporation or in the disposition of corporate assets committed to his charge;

(B) The acquisition by himself, transfer to others, loss, or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties; and

(C) The appropriation, in violation of his duties, of any business opportunity of the corporation;

. . . .

(b) An action may be brought for the relief provided in this Code section and in Code Section 14–2–154, relating to the lia-

bility of directors in certain cases, by the corporation, by a receiver, trustee in bankruptcy, officer, director, or judgment creditor thereof, or by shareholder in accordance with Code Section 14–2–123 relating to derivative actions.

(c) No action shall be brought for the relief provided in this Code section more than four years from the time the cause of action accrued.

### Former O.C.G.A. § 14–2–154

Additional liability for directors is detailed in Former O.C.G.A. § 14–2–154. This provision reads in pertinent part:

(a) In addition to any other liabilities imposed by law upon directors of a corporation:

(1) Directors of a corporation who vote for or assent to the declaration of any dividend or other distribution of the assets of a corporation to its shareholders contrary to this chapter or contrary to any restrictions contained in the articles of incorporation shall be jointly and severally liable to the corporation for the amount of such dividend which is paid or for the value of such assets which are distributed in excess of the amount of such dividend or distribution which could have been paid or distributed without a violation of this chapter with restrictions in the articles of incorporation, to the extent that any creditor or shareholder of the corporation has suffered damage as a result thereof;

. . . .

(f) No liability under this Code section shall be asserted more than six years from the time the cause of action accrued.

### Former O.C.G.A. § 14–2–285

Liquidation of corporations and their assets are permitted pursuant to former O.C.G.A. § 14–2–285, which reads in pertinent part:

(a) The superior court shall have full power to liquidate the assets and business of a corporation:

(1) In an action by a shareholder when it is established:

(A) That the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, that an irreparable injury to the corporation is being suffered or is threatened by reason thereof, and that it is impractical for the court to appoint a provisional directors as provided in Code Section 14–2–142 or to continue one in office;

(B) That the acts of the directors or those in control of the corporation are illegal or fraudulent;

(D) That the corporate assets are being misapplied or wasted[.]

### New O.C.G.A. § 14–2–1430

Under the new Georgia Business Corporation Code of 1989, O.C.G.A. § 14–2–101, *et seq.,* the courts may dissolve or liquidate a corporation pursuant to new O.C.G.A. § 14–2–1430. Section 14–2–1430 reads in pertinent part:

The superior court may dissolve a corporation:

(2) In a proceeding by a shareholder if it is established that:

(A) The directors are deadlocked in the management of the corporate affairs, the shareholders are unable to break the deadlock, and irreparable injury to the corporation is threatened or being suffered where the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally, because of the deadlock;

(B) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal or fraudulent in connection with the operation or management of the business and affairs of the corporation, and the proceeding is initiated by the holders of at least 20% or more of all outstanding shares of a corporation;

(D) The corporate assets are being misapplied or wasted[.]

### O.C.G.A. § 23–1–10

Unclean Hands Doctrine. O.C.G.A. § 23–1–10 reads "He who would have equity must do equity and must give effect to all equitable rights of the other party respecting the subject matter of the action."

### O.C.G.A. § 51–12–5.1

Section 51–12–5.1 is the statutory authority which permits punitive damages. The statute reads in pertinent part:

(a) As used in this Code section, the term "punitive damages" is synonymous with the terms "vindictive damages," "exemplary damages," and other descriptions of additional damages awarded because of aggravating circumstances in order to penalize, punish, or deter a defendant.

(b) Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

(c) Punitive damages shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter defendant.

(d)(1) An award of punitive damages must be specifically prayed for in a complaint.